We have two matters on our docket this afternoon. The first was the state of Texas v. the United States Environmental Protection Agency. Good afternoon and may it please the court, my name is Dustin Magomfar and I represent the United States. With me here at council table is Andrea Carrillo from EPA's Office of General Counsel. EPA's motion to dismiss or transfer should be granted for three reasons. Before we get to that, can I ask y'all some questions? I'm going to ask them to both sides. And the answer may be obvious, but we did some looking. I was curious if you think 28 U.S.C. 2112 applies in these circumstances, 1A5 I believe, when you have two appeals of the same agency order filed in different courts of appeals. The record is supposed to be filed in the first filed court and then there's supposed to be various proceedings. Bottom line, who should be deciding the venue motion? Us or the D.C. Circuit? Does 2112 apply? So EPA's position, your honor, is that the judicial review provision of the Clean Air Act takes precedence over 2112. How is that when you've got, the Sierra Club was the first to file in the D.C. Circuit, so you've got two different appeals or petitions for review of the same order, and I don't see that the EPA addresses that specific situation on who decides competing venue motions or venue issues. That's correct. We did not address 2112 in our motion. We have looked at it, and as your honor noted, Sierra Club was the first to file, and under 2112, the application would require this court to transfer to the D.C. Circuit, but then 2112, of course, provides that there can be further proceedings and further transfer if necessary. But EPA's position, which we've taken, held in before, and there's a Sixth Circuit case that I'm afraid I don't have the citation to, but I can provide it subsequently, that has indicated that the 2112 comes into play if there are multiple potential venue under the Clean Air Act. So, for example, if this were a decision on a state implementation plan for multiple states and multiple circuits, and so you could say, well, it's locally or regionally applicable. It could be filed in Fifth Circuit. It could be filed in the D.C. Well, that's assuming there are two proper venues. Correct. In our position. Obviously, there's only one proper venue here, but to me the question is of orderliness. Who decides the venue issue? Because it's potentially correct in the D.C. It's one or the other, and who decides? That's correct, your honor. Again, we didn't brief this issue. We'd be happy to provide supplemental briefing if the court would desire on this question. Again, as we read 2112, because of the order in which the petitions were filed under 2112's requirements, this court would need to transfer to the D.C. Circuit. But, again, we didn't put forward that position in our briefs because our position is the exclusive venue under the Clean Air Act. Another question related to what Judge Owen's asking. Let's say we deny your motion and say this needs to go forward in the Fifth Circuit, but the D.C. Circuit in the Sierra Club case challenging the supplemental rule or the other cases they have, I understand Texas might dismiss its own challenge, but let's say some of those stay in the D.C. Circuit and the D.C. Circuit looks at it and says, no, we think we have venue over this. You'd have this situation with the same rule being reviewed in two circuits, different circuits, because they disagree about venue. I mean, that's not supposed to be what happens, right? We agree, your honor. That's not supposed to be what happens, and we believe the Clean Air Act judicial review procedures are designed to prevent just that from happening. We do agree that if this court denied EPA's motion, then you would have multi-circuit review of the four air quality designations issued in the supplemental rule. The other eight areas in Texas that were designated in July are solely before the D.C. Circuit. So if there were inconsistent rulings, there could be inconsistent standards even within Texas. But those would not be ruling on Texas. Those would be ruling on the other two filings. They wouldn't be ruling on the supplemental. The only way the supplemental would have inconsistent is if the Sierra Club proceeding was continuing on. And what would happen is wouldn't happen what happened in the state VEPA, the Texas VEPA case, where those all wait, which is what happened in Texas VEPA. Everybody else waited. I'm sorry, which Texas VEPA case are you referring to, your honor? Last year's venue case that's directly applicable to this case. Right, referring to the other circuits. Well, if the D.C. Circuit entertains the petition for review of the supplemental rule, then, yes, there is the possibility of conflicting opinions if this court also. But why would it do that if in the other case where this came up it did not do so? Well, the D.C. Circuit could elect not to, but as Judge Costa said, the D.C. Circuit could also conclude that it is the proper venue. The D.C. Circuit has already consolidated all three petitions for review of the supplemental rule in the D.C. Circuit with all of the petitions for review filed of the July rulemaking. But isn't that a problem that could happen in any case where you find the local and regional and that there's a difference between the circuits on that? No, your honor. There is certainly the possibility in the context of SIP decisions, which are presumptively locally or regionally applicable, but Congress made that judgment when it set up the Section 7607 review procedure. Well, it made the judgment of what venue is. It did not make the judgment on who is to decide the venue issued. That's what I'm asking you. That is not expressly articulated in the statute. That's correct. That's right, your honor. We do agree with that. The court decided in the Texas v. EPA case that just as we have jurisdiction to determine our jurisdiction, we get to determine our venue. That was this court's holding last year. That's correct. Yes, and we're bound by that. We are not taking a position contrary to this court's decision in last year. So it's not your position that the D.C. Circuit should be deciding this issue? Well, our position is that these petitions for review, the statute says, may only be filed in the D.C. Circuit if it's nationally applicable or based on a determination of nationwide scope or effect. We assert both. So our position is that the petition should only have been filed in the D.C. Circuit, and if there are any procedural considerations such as proper venue, then it should be the D.C. Circuit in the first instance that would decide those questions. So that is EPA's interpretation of the statute that we've consistently put forward. But you're not arguing that there's something wrong with the Texas v. EPA case that says we have the right to determine the venue? That is this court's precedent, and we respect that. Okay. Just to make one other point on the national uniformity issue that Judge Costa raised and the possibility of conflicting or overlapping review, this circuit and Texas v. EPA, the 2011 decision, recognize, quote, that Congress intended the D.C. Circuit to review matters on which national uniformity is desirable. The Seventh Circuit, with respect to the same air quality designations, made the same observations just a couple of weeks ago. And there is a very practical concern here for why EPA takes a national approach to promulgating initial air quality designations and why national uniformity in the judicial review of initial air quality designations is important. And that is because a nonattainment designation triggers a series of other requirements under the Clean Air Act, and those requirements have consequences. So if it were easier in certain regions or certain parts of the country to be designated nonattainment or if it were harder to be designated nonattainment in certain countries, that would lead to inequitable outcomes, and it would lead to an inconsistent application of the Clean Air Act across the country. The state says it seems to me they're challenged on the merits, which, you know, we don't have fully in front of us, but it seems to be challenging the model that was used to determine the air quality. And they say it was unique because in the four Texas instances, the Sierra Club modeling was used. Is that different than the modeling that was used in the two prior rules that issued? I want to answer that question carefully so that there's no misconceptions. The modeling that is done is for each particular area. So someone will submit for County X and say, here's the modeling for that area. The fact that modeling was used, that third-party modeling was used, is not unique to these four areas in Texas. Third-party modeling was used for the other eight areas in Texas. But not the original. The modeling was used in the second rule that issued, not in the very first rule. No, it was used in both, Your Honor. So there were numerous areas, I would say possibly even a majority of the areas. What do you mean when you say third-party modeling? Are you talking about specific, just the fact that some other party proposes it, or the technical way that it was modeled? No, it just refers to the origin of the modeling, so that a state submitted the modeling. Was the actual modeling used in Texas different than other modeling? So that gets into the question, Your Honor, of EPA's technical assessment of the modeling data that was submitted. Again, because modeling is to model a particular air quality area, it's not going to be literally the same data. But what EPA did at the outset, so if we go back to the beginning when EPA sets forth how it's going to proceed nationally to do air quality designations under this particular air quality standard, because EPA's approach reflects the particular air quality standard at issue. So we're talking about the 2010 SO2 standard. EPA said, We believe we have the authority and that it is appropriate to consider modeling in making determinations of whether an area is in attainment, non-attainment, or unclassifiable. EPA issued extensive guidance and regulations pertaining to how modeling should be performed, how EPA will assess modeling, and consider the modeling that is submitted to it. EPA then implements that approach consistently across the country. Let me cut through this a little bit. In the final rulemaking, if someone wanted to challenge your EPA's conclusions about air quality modeling, and they also wanted to challenge the same issues in the supplemental order that we have in front of us, could they do it in both or are they confined to challenging it in the final rulemaking? The final rulemaking, you mean the July rulemaking? Yes. Well, we think the argument could be raised in both because both are based on the same overall rulemaking effort. So EPA started at the outset and said, Here are all the areas we're going to designate in Round 2. Here is our guidance. Submit us data. They consulted with the states, and then they proposed all the designations at one time. They finalized 61 of them in July, and then they finalized these four in Texas later in December. But it's all based on the same implementation of a nationwide approach. So I see that I'm out of time. Unless the Court has further questions, I will. I do have another question. Yes, Your Honor. You cite the Seventh Circuit's decision in Southern Illinois and also the Tenth Circuit and ATK launch, but isn't it true that both of those cases involved review of a single rule and that the rule at issue was applicable to numerous areas across the country? Don't those cases actually support the states' arguments because they show what would happen in the opposite situation to that that we face here? So my answer in two parts is yes and no. So yes, in ATK and in Southern Illinois Power, there was a single EPA action, so a Federal Register notice, that was at issue. Like both of those cases, and the reason that we argue that they provide support here for the conclusions regarding the supplemental rule is if the four areas in Texas finalized in the supplemental rule had been finalized as the same rulemaking in July, there would be no credible dispute that that's a nationally applicable rule and the D.C. Circuit is the exclusive venue. But you and the Sierra Club chose to do it this way, so why don't you have to live with the decision that isolated Texas and allows Texas to stand alone? Texas does not stand alone, Your Honor. There are four areas in Texas that were finalized in December. It's important to recall that there are eight other areas of Texas that were finalized in July. Correct, but those are not at issue. It's these four areas and the methodology used, the Sierra Club methodology used in those. It's not Sierra Club's methodology. Sierra Club submitted modeling. But isn't it the modeling that was accepted by the EPA? EPA used the same approach to modeling and how it evaluates modeling, how it characterizes modeling, what it looks at, what it accepts, whether information is reliable or representative for all 65 areas that were designated as part of the Round 2 designations. So the only distinction between the Southern Illinois and ATK and what we have here is that four areas were published in a separate federal register notice. So we think and what we have argued is that there are a number of factors considered by courts when looking at the applicability, whether it's national or local, that the courts can consider. Let me ask you a question. Let's assume, first of all, in the final rulemaking, the original proceeding, what is the biggest issue in that? Do you anticipate the biggest issue in that case to be? Well, not all parties have filed statements of issues in the D.C. Circuit, and even those are binding. So at this point it would only be speculating as to what issues are going to be raised in the D.C. Circuit. Based on comments submitted by different parties, it is possible that the propriety, whether EPA has the authority to use modeling. Okay, I got that. I want to make sure that's the case. I want to give you a hypothetical here. Let's assume that a party or a state did not file a petition for review in the final rulemaking, did not file a petition for review in the July Phase 1 of Step 2, but did file a petition for review in the third and challenges modeling. Is it your position that they can do that or that they had to have filed a petition for review in the final rulemaking to get at the modeling issue? Without, you know, there are various things such as administrative waiver, et cetera, but putting all of those aside, generally speaking, yes, we believe those issues could be raised in a challenge to the separate rules. So you're not foreclosed by? Because it's the same, because the rules stem from the same proposal and share the same administrative record. So all the interpretation. So you wouldn't, if someone had filed, did not appeal in the other two cases, you wouldn't file a dismiss, you should have appealed sooner, this is just an application of those rules to these facts. So while we describe the Round 2 designations as one overall rulemaking effort, we also recognize they were published in two distinct Federal Register notices. Each of those actions is separately subject to judicial review. But what those rules share in common and thus. . . Would you file a motion to dismiss or not? So you don't have standing. If you were going to challenge our methodology, you should have done it, you should have taken a petition for review from the final rulemaking. I don't believe EPA would file such a motion, Your Honor, because EPA's definition of nonattainment and its analytic rubric for understanding nonattainment is at the core of both final actions. So it's at the core of the overall rulemaking, but it's also at the core of the July action and the December action. So it could be reasonably challenged in a petition brought of the December action, which we argue indicates that the rule is nationally applicable or in the alternative is based on a determination of nationwide scope or effect. Because that key determination, what does nonattainment, what does unclassifiable, what does attainment mean for the 2010 primary sulfur dioxide standard, that's at the core of the overall rulemaking and in both final actions that were published. So that is the basis for EPA's action, which then applies to local data in making an air quality designation decision for an individual area. Thank you, Counsel. Good afternoon, Your Honors. May it please the Court, my name is Joshua Smith. On behalf of Sierra Club, I wanted to follow up on a couple of questions on the national uniformity issue. Before you do, can you respond to that point that was just made? If you're able to do so, it may not be in your area. But if we would treat these as two separate actions by the EPA, why would in these other considerations about whether there was raised judicata, whether you should object at certain times, if we're going to treat them as two stand-alone actions, why are we treating them as one for purposes of this proceeding today? Well, as the Court recognized in the 2011 Texas EPA decision, the Congress's clear concern with national uniformity about matters with which national uniformity is important is clearly a factor in deciding these issues. And this case raises the potential for conflict in more than one way. And, in fact, there are four different ways that it does raise that conflict. Not only did Sierra Club file its... But it wouldn't raise the conflict if, in challenging this supplemental rule, you're only limited to challenging the application of this methodology that was created in the prior rules, right? I mean, if it were so limited in this third rule, you wouldn't have the conflict. The methodology is inextricably bound up and based on methodology that was applied to all of the other 61 areas that EPA designated, including the other eight areas in Texas, which the petitioners chose not to challenge. What specifically about that methodology was used nationwide? There is a five-factor test that EPA applied. For determining the area. For determining the area. And at each step, the first step, for example, EPA considered air quality modeling or monitoring that might be available in the area. It considered emissions from the sources, from the different sources, and other factors. So applying these methodologies and the 65-page technical assistance document that EPA developed for making these designations across the country, all of these issues are interrelated. And there is a serious risk that there would be different standards that apply, not only across the country, but within Texas itself. And as I mentioned, as you discussed at the outset, and I think it was Judge Elrod who mentioned it, Sierra Club has filed a separate petition challenging these designations as insufficiently protective. The Texas petitioners chose not to intervene and have not moved to dismiss that case. And that's why this motion to dismiss is pending here. That's what I understand. I thought the Sierra Club filed a petition for review of the supplemental order, and that Texas and Luminate also filed petitions for review saying more or less in a protective manner, saying, but we think venue lies in Texas. Now, isn't that a petition for review of the same order in the same proceeding? It is. They haven't moved to dismiss the D.C. Circuit proceeding. So regardless of this court's venue determination, Sierra Club's affirmative claims are going to go forward in the D.C. Circuit. Well, how do we? Okay, if that's true, then why shouldn't there be some statutory mechanism and isn't there some statutory mechanism for having one court, either the D.C. Circuit or this circuit, decide the venue question for both of us? Under the Clean Air Act, there isn't such a mechanism. The Clean Air Act allows the EPA. Well, you're just saying that the D.C. Circuit is going to go forward on Sierra Club's petition no matter what. And we can't both be right. We decide we have venue and they decide we have venue. We can't both be right, can we? I think that's correct, Your Honor. So who gets to decide the venue? Who should decide under the statutes the venue issue? Because of the procedural posture of this case, the motion is before this court, and this is the court that will decide the venue determination. But the D.C. Circuit may decide it doesn't have venue if our opinion hypothetically said that we have venue, couldn't it? You're assuming that they're going to decide that they are the ones that have venue. If they look at the supplemental rule separately, also on the supplemental rule appealed by the Sierra Club, they could come to the conclusion that there's not proper venue there, couldn't they? And peel off the consolidations. In our view, the two rules cannot be broken apart or parsed that easily. Our claims in particular implicate some of the adjacent counties in Texas that EPA designated as attainment and implicate whether EPA properly applied the 65-page technical assistance document to making those determinations. Again, and in our view, EPA's determination should have included other sources and could have included a broader geographic area than the final determination. So in our view, they can't be separated. But if the court says supplemental means supplemental, and that's the action at issue, and therefore if the Fifth Circuit were hypothetically, again, we don't know what the Fifth Circuit's going to decide today, then the D.C. Circuit could say, well, if the supplemental rule stands alone, then because B applies, C doesn't. Well, no one has challenged the fact that the other eight areas of Texas are properly before the D.C. Circuit. So our claims relating to those areas would remain there. And those could continue and be deconsolidated. But the two are inextricably linked, again, because they're based on modeling, specific modeling that applies to all 12 areas or not all 12 areas, all four areas at issue here. Your brief talks about whether it's reasonable or not on the EPA's finding about that they're nationally applicable. But that's not the test, is it? The test is whether the EPA can show that an exception applies and that it's reviewed de novo. Isn't that the test? So generally speaking, in a SIP situation, there is a presumption that the SIP is locally or regionally applicable unless an exception applies. And in this case, even if this was regionally and locally applicable, which it's not, an exception does apply because the rule is based on the same methodological approach, the same record that all the other 61 areas were based on. And I do want to come back to one other point that you made just to clarify. The Seventh Circuit's decision involved two separate petitions relating to two separate final agency actions, a petition challenging the area designations and a separate petition challenging EPA's denial of the motion of a petition to reconsider. Those are separate agency actions. And under the Texas petitioner's view, those should be broken apart and reviewed separately because the latter involves only issues involving Illinois. I'd also point out that the D.C. Circuit's opinion in Mississippi Commission of Environmental Quality and this Court's decision in the 2011 Texas v. EPA case also involved separate final agency actions. So the national, the character of the rule can't turn on simply breaking it apart and that kind of formalistic approach. But the Court wouldn't be breaking it apart. It would have been the agency's choice. The agency can make the choice to issue two separate determinations. But under the Texas petitioner's logic, the 2011 case, the Mississippi Commission case, and even the Seventh Circuit case should have at least part remained before those circuits. And they rejected, they didn't consider that as an option and transferred to the D.C. Circuit or held the case in the instance of Mississippi Commission. And I see that my time is up. But if you have additional questions, I'm happy to answer them.  Thank you, Your Honors. Good afternoon. May it please the Court, my name is Stephen Jader and I represent Luminant Generation Company, the owner of the power plants in the four local Texas areas that are subject to the final rule at issue here. With me at council table are my colleague Julia Barber for the State of Texas, Nancy Olinger, and Craig Pritzlaff. Ms. Olinger will present argument for the State of Texas after my time. Let me jump right in on Judge Owen's question. And it has been a while since I read 28 U.S.C. 2112. And I remember it as being a difficult section to figure out. But as I recall, there is nothing in that section that requires this court to defer to the D.C. Circuit on the venue issue. And the policy underlying that section is fully met here. There is no risk of conflicting results here. The D.C. Circuit has not set a deadline yet. There's a deadline out in the future that's been extended for motions to govern. Those motions to govern, should this court retain venue, will include a motion from us to sever Sierra Club's petition and transfer it back to this court. So everything will be done in an orderly fashion, and there's no risk of conflicting results on that particular point. But normally, when first filed, when? It seems odd that the second filed court would be the one that gets the case. There's something counterintuitive to that. Well, the way that these cases have gone down, the way the procedural posture of this court has the motion to transfer in front of it. The government's position is that 2112 does not apply in Clean Air Act cases. So they didn't move on that grounds, and they will not move on those grounds. So this court doesn't have a motion in that regard before it. I'm not saying this court couldn't invoke 2112 if it wanted to, but what I'm saying is it doesn't have to, and the policy considerations in this particular case are fully met. Even aside from the statute, the first to file rule gets applied by courts, even when there's not a particular statute or rule, just as a rule of judicial economy. So do you think we're precluded from applying a first to file rule and deciding who gets to decide venue? Under the Clean Air Act provision that says venue is proper in one of these two places, yes, I do think. You would not just apply that common law principle. But that's always the case. It's always the case that there is a specific rule of jurisdiction or venue, but the question is who gets to decide it. The issue wouldn't be that you lose your argument that venue is here. It's a question of who gets to decide it. I thought you were discussing the first to file rule in the sense of, say, in a district court case. Oh, no, the first to file rule and who gets to decide the venue question, which I think is what Judge Owens is getting at. I don't think anyone's saying that just because they filed first in D.C. that makes D.C. the proper venue. That's how I understood the first to file rule. No, the first to file rule means the jurisdictional venue threshold questions get decided in the first place it was to file. Not that filing creates that venue. Well, I don't think there's anything that prohibits this court from deciding the motion that's been filed by the government on the grounds that the government filed it. You understand the problem, and I'm just asking you. Surely there's a statute out there or there's something we should look to in these situations. Your Honor, I don't see a problem because last year in the Regional Hayes case, we filed protective petitions in the D.C. Circuit and the Tenth Circuit. And, yes, it was complicated keeping all those courts apprised of what was going on, but those judges understand exactly what's going on. They've deferred moving forward with that D.C. Circuit case. Well, add a comedy. Sometimes federal courts have to work that way, Your Honor. Let's explore your statement that there's no risk of conflicting results in these cases. I want to ask you the same hypothetical I asked the EPA lawyer. Let's assume that Texas didn't file any kind of petition for review as to the final rulemaking in which this methodology was discussed. Let's assume that everybody's going to fuss over the modeling and whether the EPA got that right. If you did not file a petition for review from the final rulemaking and you did not file a petition for review on the first step of the second part, part two, can you, by appealing the supplemental order alone, challenge the methodology that was set forth in the final rulemaking? Here's the problem with that question. There is no methodology. There is no national methodology. You cannot find it. You cannot find it in that July rule, and you cannot find it in this rule. What about reliance on third-party modeling? Isn't that going to be part of the challenge you bring? Well, what they did is sometimes they relied on third-party modeling, sometimes they didn't. This so-called common analytical approach, when you look at what they say what it is, it is not a bright-line rule. They disavowed any bright-line rule in this. Okay, but going back to the conflict question, if this stays in our court, and our court a year or two from now, however long this thing plays out, says, oh, EPA cannot rely on third-party modeling, whether it's the Sierra Club or industry or local government modeling, because the phase two rule relied on third-party modeling, wouldn't us saying that was improper and if the D.C. Circuit says it's proper in the phase two challenge, you'd have that modeling be permitted in some instances around the country and not in others? A couple of points. It's the nature of the action that controls. It's not our challenges. We get that. Wouldn't there be a conflict on the third-party modeling? We submitted modeling. My client submitted modeling to EPA. It's not a question of this modeling. When you look at the action that EPA took here, page two of the rule, the designations are based on the weight of the evidence for each area, including available air quality monitoring data and modeling. That is what EPA is going to defend its decision on. Are you going to challenge on the area designations, the five-factor test? That, to me, pretty clearly seems to be applied throughout these different rules. The so-called five-factor test, we don't have an issue with the boundaries. Or the 50-kilometer test. I don't think our comments even raised issues with the boundaries. Let me raise one broader issue, which this discussion, I mean, I'm having trouble. It's difficult to figure out in a vacuum, take the third type of venue, a regional rule that's based on a determination of national scope or effect. It's hard to really figure out whether the determination is based on a national scope or effect in this vacuum where the case hasn't been briefed. The state, at least, and I think it's your consolidated response with the state, at the end you say one option is to carry this with the case, which is what was done in last year's Texas v. EPA decision that Judge Elrod authored. Related to that, if we were, let's say we deny the motion then. Wasn't it carried with the merits? I think it was. No. If it was, well, the opinion talks about the merits and the venue. Anyway, the state's prayer asks for that. If the, if we deny the motion now and keep the case in this circuit, and then the briefing happens a year from now, a merits panel says, wow, you know what, this really is challenging these national methodologies. That really is what is at the core of the determination. Could that court reconsider whether venue is proper when there's a more concrete example? Could the merits panel reconsider a motions panel decision on venue? Well, if we carried the motion with the case. If we decided not to decide the venue motion. Then absolutely the merits panel could decide venue at that point. But even if we decided now but then it became apparent later that the rule has a different scope or is based on a different scope. The opinion last year, which we consider to be binding precedent, said that the venue determination was final. So we would assume that if this panel decided venue that the merits panel would not also decide that. Let me also just continue to address this issue of nationwide scope and effect. What this court looks at is not what it anticipates or the government anticipates that we're going to argue. We get that. My questions are what can you argue? Are you foreclosed from arguing or can you? We are going to argue. If you can challenge. There is nothing. If you look at this five-factor test, for example, it's in what's called the Johnson memo. This is the technical assessment document that Mr. Smith was referring to. It's at index 203. Let's just cut through this so we can have some concrete examples. Yes, ma'am. What are you going to raise in your petition for review of the final rulemaking? We are going to say that the modeling that EPA relied on, which is the only basis it gave for these specific designations. No, I'm talking about have you filed a petition for review of the overarching rulemaking? There is no overarching rulemaking, Your Honor. The July rule was simply a few other states. This rulemaking, what they call this big rulemaking, has been chopped up into a series of small final actions. And it's the final actions, as published in the Federal Register, that this court is to look at to determine venue. So what are you challenging in the supplemental rule, which is the final action? What is it that you're saying? We are challenging Sierra Club's modeling that EPA relied on. We are challenging this. This is a picture of the results of the modeling around Big Brown Plant. So you're not challenging whether or not Sierra Club can help model, because, in fact, you say you can help model, too. I don't think there's a finding or a basis in the rule here to challenge that. You're challenging only the model itself. No, we're not challenging the model itself. We're challenging the results of the modeling. What are your legal issues? The legal issues are this does not reflect the current conditions around our plant, that emissions are much lower than this. Are you going to say they applied the wrong standard? I'm saying the way they analyzed the data came up with the wrong result. These areas are not in non-attainment, which is what all the definitions are. The models didn't accurately capture the air quality in that area. Either for the inputs or the way it resulted. This is the challenge. It's not a legal. There's not a legal memo with the five points that you're talking about. It says it's not reviewable final agency action. It's the government's position that these technical support documents and all those things are unreviewable by this court, by the D.C. Circuit, or by any other court. The D.C. Circuit is going to be looking at different charts for different places for different data. Sometimes EPA used monitoring. Sometimes it used modeling. Sometimes it used both. Each has to be decided on its own merits, and that's the nature of the challenge. What this court says about those four designations is not going to conflict with anything that the D.C. Circuit says about all those other designations. Sierra Club's lawyer just said, though, that it interferes in certain counties. There's spillover effect. And is that do you agree or disagree with that? We disagree with their position on that. And if they have concerns about these four designations, three of these four were nonattainment. That's our gripe, are the three nonattainment. In the other case in July, none of them were nonattainment. They were all accepted, the state's recommendations. We don't have a problem with those. Sierra Club may have a problem with those. They can litigate those to their heart's content in the D.C. Circuit along with all the others. Why did you file a motion to transfer on the D.C. Circuit? Why did we not? Sierra Club's got a petition up there. What happens to that? We simply responded to the government's motion here. When motions to govern are due in that court, which they're not due yet, they have a strict deadline for a motion to govern. A motion to unconsolidate. Our petitions were consolidated sua sponte. Nobody, it was not a decision by the court that our petitions on the December rule were supposed to be litigated there. It was simply sua sponte. And so what we will be following. So the appeals office does it just as a matter of course, or are you saying the court decided it's sua sponte? Or you don't know? I don't exactly remember. We did not have a say in that consolidation. There's a procedure for us asking them to be deconsolidated and transferred back, or we might just dismiss our petitions that we filed there as a protective matter. It seems like in all these challenges there's a combination of, right, there's some overarching national issues like what does the statute mean, what are the levels going to be, what modeling is appropriate, what's the area going to be. And then you're pretty much always going to have to apply that to fact-specific situations involving particular areas. And so I guess it comes down to, in that third category, which predominates. Well, can you give me an example? My question is, can you give me an example of something that's a local or regional rule? Say this is a local or regional rule that would nonetheless be based on a determination of national scope. Yes. So one example might be if you had a rule, a final rule, that adjusted emission allowances, okay, in a nationwide trading program for only one state, okay. So the rule applied, had a legal effect only on the emission allowances for that one state. But the practical effect, because it was a national program, meant that allowances in other states might either be added or deleted from those accounts. So that is a locally applicable rule because this court's precedent says you would. Like the case in the Seventh Circuit overruled. Like the case in the Seventh Circuit. Now, they didn't address that up front. They addressed it later. I see that I'm out of time, or did I get some more time? I will relinquish the podium to my colleague. Thank you. Nancy Olinger on behalf of the State of Texas and the Texas Commission on Environmental Quality. And I want to discuss the consent decree that underlies the procedure and schedule that was followed here that kind of got us to the situation that we're in. And certainly it's our position that no weight should be given to EPA's argument that there's some special significance to the fact that the July 2016 rule and this December 2016 rule that deals with the Texas area designations comes from what EPA calls its second round designation, and therefore it's somehow part of the same rule. The designation process and schedule that EPA followed here is wholly outside of the Clean Air Act. And the cooperative federalism that animated the Clean Air Act when it was first promulgated. The Clean Air Act has very clear and a precise process for NAAQS area designations with roles for the states, which make the initial designation recommendation to EPA and for EPA. And there are firm deadlines in the act for the states and for EPA to act. And if there's not enough information for EPA to make a designation, the act explicitly states that the areas to be designated are unclassifiable. And while the Clean Air Act does have a deadline by which EPA must make all designations, a deadline that EPA did not meet, it doesn't require that they all be made at the same time. It could be a nationwide designation for all areas. So Texas made its deadlines. EPA didn't. And when EPA did not make its deadline, Texas along with several other states, North Dakota, Louisiana, Kentucky, and Nevada and Arizona sued EPA in North Dakota District Court. But Sierra Club sued EPA for not making its deadline first, and they sued in the Northern District of California and then asked that the North Dakota suit be abated. So the states then intervened in the California District Court case. But that case never went to a hearing on merits. And the reason that it didn't was that EPA and Sierra Club entered into a consent decree that changed all the deadlines. Don't you have an appeal pending of the consent decree saying it can't extend the statutory deadline? Yes, we do, Your Honor. What's the status? It's been argued? It was argued in March. And the thrust of our argument there was that the consent decree improperly amended the Clean Air Act. And our position has been, it is today, that this afternoon EPA could make all the designations. They would simply say unclassifiable for areas they don't have information on. Now, that doesn't mean it's going to be unclassifiable forever. For example, in Texas, you know, we send our monitoring data to EPA every year. So an area that's unclassifiable, the EPA could look at the data, the monitoring data and the modeling and determine it's not attainment, or an area that's not attainment could become an attainment. But the Clean Air Act is very clear that at the time of that deadline, if there's not enough information, EPA was to say unclassifiable. And our position is that, you know, this consent decree, the Texas and the other states had zero input in it. We were not even allowed to see it. We were told we could look at an outline of it. It was entered over our vociferous objections. You know, we are appealing it. And it's easy. If these four designations were made as part of the phase two rule, the other eight. The second round, I think. Second round. Second round. That the Seventh Circuit considered. Does Texas concede that that is a national rule? Well, even that second, let's say July. You know, they've cut up the second round into different chunks because they had the big designation July. Then they pushed Texas by these stipulations. Again, Texas wasn't involved. That was between Sierra Club and EPA. And they still haven't made a designation for Oklahoma. So that's been chopped up. But even if Texas had been in the July 2016 rule, that still would not, it didn't cover all national areas. Maybe there would be an argument that it would have been of nationwide scope. Well, the Seventh Circuit found that, right? True. But you don't necessarily agree with the Seventh Circuit? You don't have to. It's fine if you don't. Well, I would say we don't necessarily agree, but that's really not the issue here. Because what we have here is a very. I'm trying to get a sense of where Texas thinks the dividing line is between regional, local versus national. Well, you know, even in the July 2016 rule, which, you know, we did not, we didn't file a suit there. And our positions we couldn't have because we weren't aggrieved. They accepted our designations, and the areas in Texas were all attainment or unclassifiable, so it didn't put any duty on us. So we're taken a little bit to task, I think, in the corrective reply for choosing not to file a suit. But our position is we couldn't have. But, you know, even there, you know, to be lumped in with all these other states, when these are very intensely factual determinations for each area, I think it puts every state at a disadvantage. But, you know, in our case, what we're looking at here is a final action that just applies to Texas. It doesn't impose a duty on any other state, just Texas. And it seems plain to us that it is a rule that is only locally applicable. Thank you. I want to try to quickly go through a number of points that have been discussed. So briefly back to the 2112 question. Our position is not that 2112 is never applicable in Clean Air Act cases. When there are multiple, like, appropriate circuits under the statute, then our position would be that 2112 would be the answer. We didn't move on 2112 because our position is that the D.C. circuit is the exclusive venue. But in terms of Judge Owen looking for an answer in the statute, all I can point to today is that the Clean Air Act specifies where petitions may be filed only in the D.C. circuit or the regional circuit as appropriate. And then otherwise, I'm not aware of another answer beyond 2112. Otherwise, it would seem that just whichever court takes up a motion to dismiss or transfer first would be making that decision. And that's not necessarily kind of a principled basis set forth by the statute. So again, we can provide supplemental briefing if the court would like. But under the dates and how 2112 works, our position is that it was first filed by Sierra Club. There were no other petitions in the first 10 days, so it doesn't trigger the lottery. So this court would need to transfer to the D.C. circuit, which could then make whatever decision and further proceedings. On to this question Judge Costa, you raised of what is applied nationally and counsel for luminous contention that there is no uniform methodology. That's simply incorrect. I would point the court to the Tenth Circuit's decision in ATK launch systems, which said that EPA's analytic rubric is a single interpretation of the key statutory term. And so to explain that a little bit, the statute simply says a nonattainment area, for example, there are other kinds of areas, but a nonattainment area does not meet the air quality standard or contributes to an area that does not meet the air quality standard. It doesn't say how do you determine that, what information is acceptable or reliable to make that determination. EPA lays all of that out in a legal interpretation and how it approaches evaluating data that is submitted to it and what it can be considered reliable, representative, what the best information is. But that analytical rubric is not being challenged today. Instead, the answer for each area within four places in Texas is what's being challenged. Why should we not take the EPA at its word that the supplemental rule is based on area-specific determinations, not determinations of nationwide scope and effect? But that's not EPA's position, Your Honor. He did say that it was based upon area-specific determinations in the supplemental rule. So this goes to the weight of the evidence statement that the petitioners are isolating in a vacuum and ignoring everything that comes before you get to that statement. So everything I explained, EPA's national analytical framework, what the Tenth Circuit said is the interpretation of nonattainment, that comes before. That is how EPA is going to take it. That's not an issue. Can you articulate for us what you think Texas and Lemonade's issue is going to be, other than the outcome? How is it going to be framed? I can't speculate beyond what counsel has said here today. But we certainly agree. I think everybody is in agreement that it is the nature of EPA's action that is on which venue decisions are made. So what they are going to argue on the merits can be relevant in two ways, we would argue. One is it can potentially be illustrative of the nature of EPA's action. For example, since the court takes a de novo review of weather rules based on determination of nationwide scope or effect, if there are issues of determinations of nationwide scope or effect that were made, that suggests that. Tell me what that would be. I'm trying to get you to articulate. What nonattainment means. So EPA's interpretation of nonattainment for. . . I don't see attainment, nonattainment defined in this document, this rule, other than by very specific measurements. Are those at issue? Y'all went through a hearing, a tested hearing, I take it. What were the issues? Well, so, for example, there were comments made by Luminant and others about whether EPA had the authority, period, to consider third-party modeling data or any modeling data for whether that is a reliable basis or permissible basis under the Act. But that's not at issue here. In fact, Luminant submitted its own modeling data, so they're not saying that you can't do modeling data. I'm just representing what their comments said. What they choose to bring on the merits does not determine whether EPA's action is based on a determination of nationwide scope or effect or is nationally applicable. EPA even said in the supplemental rule on page 45044, to determine model-based violations, the EPA believes that dispersion modeling is an appropriate tool as discussed in the modeling technical assistance document. That technical assistance document, EPA's technical support documents in this record, lay out all the things that EPA has said is required for modeling data to be submitted and how EPA will evaluate it. Now, we strenuously disagree with Counsel for Luminant's suggestion that we take the position that that methodology is not reviewable. If somebody filed a petition for review of a guidance document, we would then argue that that is not federal final agency action. But the application of that guidance, the application of that methodology in the air quality designations rulemaking context, is absolutely subject to review. Someone could bring an argument about whether EPA can rely on modeling at all, whether the way EPA relied on modeling is acceptable, whether the criteria that EPA considered in determining whether modeling data is sufficiently reliable is allowable.  Yes, Your Honor. What specifically overcomes the default presumption in this case? There is no default presumption, Your Honor. Assume, arguendo, that our case law provides a default presumption in this context when two applies, one doesn't apply, two applies, but three may apply. And we have said that there is a default presumption that where two applies, three has to, you have to overcome a default presumption. So assume there is a default presumption. Can you win if there's a default presumption? And if so, what is your best evidence? I don't concede or agree that there is a default presumption. But let's assume that this rule, the court concludes this rule is locally or regionally applicable. So we're in Type 2 land. Then the question, if I understand Your Honor correctly, is what is the determination of nationwide scope or effect that the supplemental rule is based on, which this court has said needs to be at the core of the rule? Well, the first question was can you overcome a default presumption if there is a default presumption? Yes or no? The Clean Air Act does not put a presumption for air quality designations in Type 1 or Type 2. Okay. I don't want to bicker with you. I want to find out if we put this under the rubric of last year's case. This is certainly not a surprise to you. If we put this under the rubric of last year's case, and you have an argument that it doesn't apply, and I understand that argument, but if it does apply, can you overcome the presumption in today's case? Yes or no? Yes, and we have not. Okay, and can you please articulate now, which I think you were going to do, tell our court how you would overcome that presumption? We have not suggested that last year's Texas EPA decision does not apply to this case. Quite to the contrary. Both of our filings explain how, under this court's analysis, the court should conclude that the supplemental rule is based on a determination of nationwide scope or effect and therefore venues exclusively in the D.C. Circuit. Can you please articulate what is your best evidence to support that you overcome the default standard? EPA's articulation and definition of the meaning of non-attainment, attainment, unclassifiable, area, nearby, contribute to, in the specific context of the 2010 Primary Sulfur Dioxide National Ambient Air Quality Standard. As the Tenth Circuit observed, EPA's analytic rubric for how you make a decision on whether an area is attaining or not, or if there's insufficient information, that is EPA's interpretation of those statutory terms for a particular air quality standard. Okay, so you rise or fall on the analytic rubric. That's your best thing. Which is EPA's interpretation of the statutory term, which it applies consistently across the country. Where do we find that interpretation of the statutory terms? So the explanation, there is some discussion of it in the preambles and then in EPA's technical support documents where it lays out these are the modeling factors that are required, for example. EPA says modeling isn't. So one thing to note, modeling is unique to the sulfur dioxide standard. EPA doesn't rely on modeling for making determinations of violations, for example, of the other air quality standards. So modeling is unique to the sulfur dioxide world. So EPA's guidance documents and EPA's technical support documents in this record, which articulate, these are the requirements for modeling data. This is how we're going to consider modeling data and evaluate it. That is EPA's analytic rubric for in the specific context of how you make a non-attainment designation, for example. A couple other brief points, if I may. Judge Costa, we certainly agree that national rules always have local effects. And if you only looked at the local implication, then you would never have a national rule in which the D.C. Circuit is the exclusive venue. And finally, no case has been brought to this court's attention by either side, and we are not aware of any, where a regional circuit and not the D.C. Circuit has adjudicated initial air quality designations in the last 27 years since the 1990 Clean Air Act amendments. Is there any such case that involves a purely intrastate area like this one with four Texas sites only? So the example would be, I believe Counsel Sierra Club mentioned it and we mentioned in our filings, in the 2008 ozone air quality standards, EPA finalized its designations in two Federal Register actions. Both of those actions were considered together and adjudicated in a single decision by the D.C. Circuit and Mississippi Commission. Venue was not contested. The petition of the second action was filed in the D.C. Circuit, so there's no judicial decision answering this question of the circumstances presented here. Was there a case where it was adjudicated, whether within a state, was regional or not? For an initial air quality designations? Not that I'm aware of in the last 27 years. So there's nothing either way. Nobody's ever tried to do this, but there's never been a specific one like this before, perhaps. Well, I disagree, Your Honor. I just identified an example where, for the ozone standard, circa 2010, this precise situation happened. That second Federal Register action designated 12 counties solely within the Seventh Circuit. So that would have been quintessentially regional by an ordinary term. EPA said it was nationally applicable, and it was reviewed by the D.C. Circuit in tandem with its other Federal Register action, which, like here, applied much more broadly. But was there a challenge? No, Your Honor. As I said, there was no challenge. There's never been a challenge. Correct. Our point is just, since the 1990 Clean Air Act amendments, EPA has consistently taken a national approach to making its air quality designations  So unless the Court has any further questions, we would ask that EPA's motion to dismiss or transfer be granted. Thank you. We have your argument.